IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARIE MADDEN,                          :
                                       :
          Plaintiff                    :
                                       :     **CIVIL ACTION NO.  3:04-344**
     v.                                :
                                       :     (JUDGE NEALON)
WYOMING VALLEY HEALTH CARE :
SYSTEM, INC.                           :
                                       :
          Defendant                    :

**MEMORANDUM AND ORDER**

On February 17, 2004, Marie Madden filed a complaint against Wyoming

Valley Health Care System, Inc.  (hereinafter "WVHCS").  The complaint sets forth

four counts alleging that WVHCS engaged in unlawful employment discrimination in

violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq.

("ADEA"), the Americans with Disabilities Act, 42 U.S.C. § 1201 et seq. ("ADA"),

the Family and Medical Leave Act, 29 U.S.C. § 2611, et seq. ("FMLA"), and the

Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA").  On January 6,

2005, defendant filed a motion seeking summary judgment on all counts set forth in

the complaint.  (Doc. 24).  This summary judgment motion has been fully briefed and

is now before the court for disposition.   Because Madden has offered evidence

showing by a preponderance of the evidence that WVHCS's proffered legitimate, non-discriminatory reason was pretext for discrimination, WVHCS is not entitled to summary judgment on plaintiff's ADEA and PHRA claims.  Further, defendant is not entitled to summary judgment on plaintiff's FMLA claim because WVHCS has failed to establish that Madden's termination from employment was unrelated to her FMLA leave.  Finally,  since the plaintiff cannot establish a prima facie case of discrimination under the ADA,  summary judgment will be entered for the defendant on Madden's ADA and PHRA related claims.

## I.    LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56( c).  See also Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).  The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986); Young v. Quinlan, 960 F.2d 351, 357 (3d Cir. 1992).  Once such a showing has been made, the nonmoving party cannot rely upon conclusory allegations in its pleadings or briefs to establish a genuine issue of material fact.  Rather, the nonmoving party must go beyond the pleadings and offer specific facts contradicting the facts averred by the movant which indicate that there is

2

a genuine issue for trial.  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.

Ct. 3177, 3188 (1990); Fed. R. Civ. P. 56(e).  "Once the moving party has carried the

initial burden of showing that no genuine issue of material fact exists, [citation

omitted] the nonmoving party . . . 'must make a showing sufficient to establish the

existence of every element essential to his case, based on the affidavits or by the

depositions and admissions on file.'"  Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511

(3d Cir. 1994) (quoting Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992)).

To determine whether the nonmoving party has met his or her burden, the court

must focus on both the materiality and the genuineness of the factual issues raised by

the non-movant.  "[T]he mere existence of *some* alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment;

the requirement is that there be no *genuine* issue of *material* fact."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986) (emphasis in

original).  A disputed fact is material when it could affect the outcome of the suit

under the governing substantive law.  Id., 477 U.S. at 248, 106 S. Ct. at 2510.  A

dispute is genuine if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  Id.  If the court determines that "the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party, there is no

'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574,

587, 106 S. Ct. 1348, 1356 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289, 88 S. Ct. 1575, 1592 (1968)).  All inferences, however, "should be drawn in the light most favorable to the nonmoving party, and where the nonmoving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Pastore, 24 F.3d at 512 (quoting Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912, 113 S. Ct. 1262 (1993)).

## II.    STATEMENT OF FACTS

WVHCS[1] is a non-profit health system which serves the residents of northeastern Pennsylvania.  (Doc. 26, ¶ 1).  Many of the departments within WVHCS are divided into one or more cost centers, each of which has its own budget and unique service to provide.  (Doc. 26, ¶¶ 3, 7).  Employees within a particular cost center have a specific supervisor who in turn is supervised by the department director. (Doc. 26, ¶ 8).

Patient Business Services is the department within WVHCS which is responsible for billing insurance and other providers for patient services;  its director is John Stapert.  (Doc. 25, p. 3, Doc. 26, ¶ 9).  Patient Business Services is divided

---

[1] While it is noted that defendant's Statement of Undisputed Material Facts refers interchangeably to Wyoming Valley Health Care Services, Inc. and Wyoming Valley Health Care System, Inc. as "WVHCS", this memorandum shall use "WVHCS" only to refer to Wyoming Valley Health Care System, Inc. since it is the named defendant and further since it acknowledged employment of Madden during testimony before the Pennsylvania Human Relations Commission.

into four cost centers: (1) Business Office (cost center 29090); (2) Credit and

Collections Patient Accounts (cost center 29091); Billing I (cost center 29092); and

Billing II (cost center 29093).  (Doc. 50, ¶ 16).  All the cost centers in Patient

Business Services provide billing services but each cost center has responsibility for a

particular list of payors.   (Doc. 26, ¶¶ 17-23, Doc. 50, ¶¶ 17-23).  "Billing Clerk" is a

job classification within Patient Services and all billing clerks are paid and evaluated

uniformly regardless of the cost center to which they are assigned.  (Doc. 51, p.7).

The cost centers in Patient Services are organized on the basis of their member payors.

(Doc. 26, ¶ 14, Doc. 50, ¶ 14).  During a 1999 restructuring, payors were transferred

to different cost centers and the billing clerks servicing those payors were transferred

as well.  (Doc. 26, ¶15, Doc. 50, ¶ 15).   Billing clerks are assigned specific payors

and if either the payor or the billing clerk transfers cost centers then its counterpart

may transfer as well.  (Doc. 51, p. 7).  As department director, Stapert was authorized

to freely transfer both payors and billing clerks to suit changing workloads.  (Doc. 51,

p.7).

In 2002 defendant initiated a staff reduction in conjunction with a

reorganization of the entire WVHCS hospital division.  (Doc. 26, ¶68, Doc. 51, p.4).

In the event of staff reductions, defendant has a written Staff Realignment Policy

(hereinafter "Policy")  (Doc. 26, ¶ 37) which calls for reductions conducted by job

classification with employees therein terminated according to the following order set

forth in Section A, "Identification of Staff to be Reduced" :

1. Trial period employees (90 days or less of continuous service) in the job classification;

2. Employees with unsatisfactory job performance records;

3. Employees who volunteer for reduction, each request being subject to the approval of the employee's manager; and

4. If further reductions are required beyond the first three steps, employees shall be affected by continuous length of service within the Wyoming Valley Health Care System and related entities in reverse (least) order of seniority by job classification.

(Doc. 50, ¶¶ 43-44,  Doc. 26, ¶¶ 43-44).

It should be noted that the Policy does not contain any mention of cost centers or any directive to apply the above criteria only within a cost center which has been designated for reduction.  (Doc. 26, ¶ 39, Doc. 50, ¶ 39).

At the age of 55, Madden began employment with defendant in November 1995 as a clerical worker in the Patient Business Services Department.  (Doc. 26, ¶¶ 28-29, Doc. 50, ¶¶ 28-29).  In September 1997, Madden applied for and accepted a job as a part-time billing clerk in cost center 29092.  (Doc. 26, ¶ 30, Doc. 50, ¶ 30).  In May 1999 she moved to a full time billing clerk position in cost center 29093  (Doc. 26, ¶ 31, Doc. 50, ¶ 31).  In May 2000, WVHCS notified Madden that she had been

selected for layoff based upon her seniority within cost center 29093.  (Doc. 26, ¶ 54, Doc. 50, ¶ 54).  Madden was scheduled for layoff in December 2000 but WVHCS did not terminate Madden's employment at that time.  (Doc. 26, ¶ 57, ¶61, Doc. 50, ¶57, ¶61).  In March 2001, with her layoff pending, a position opened in cost center 29091 and Madden applied for and received this billing clerk position.  (Doc. 26, ¶ 33, Doc. 50, ¶ 33).  If plaintiff had not accepted this position in 29091 her pending layoff may have gone into effect.   On February 17, 2002 Stapert transferred plaintiff from cost center 29091 to cost center 29093 concurrent with the transfer of one of her payors, Qual-Med/PHS, from 29091 to 29093.  (Doc. 26, ¶ 27. Doc. 50, ¶ 27).   In March 2002, Stapert stated that he received a directive to identify employees for termination as part of the 2002 Reorganization.  (Doc. 26, ¶¶ 71-72, Doc. 50, ¶¶ 71-72).

On April 18, 2002 Stapert approved plaintiff's request for medical leave for gallbladder surgery with said leave to commence on April 26, 2002 and cease on May 26, 2002[2].  (Doc. 51, p.3).  On May 13, 2002 plaintiff notified her immediate supervisor, Pattie Wilk, who in turn notified Stapert, that she was available to return to work on May 20, 2002.  (Doc. 51, p. 3).  During the course of Madden's conversation with Wilk she also informed Wilk that she needed to see a lung specialist.  (Doc. 26, ¶ 118,  Doc. 50, ¶ 118).  Madden may have told Wilk that Madden's doctor had found a

---

[2] Plaintiff also took a six week FMLA leave of absence in 2001 for surgery for kidney cancer. Stapert approved this leave and Madden concedes that she suffered no retaliation upon her return from this leave.

spot on Madden's lung. (Doc. 26, ¶ 118, Doc. 50, ¶ 118). Upon notification of

Madden's intended return date, Stapert and Human Resources representative, Len

Paczkowski, directed Madden to obtain a physical evaluation from the defendant's

Employee Health department as to her ability to return to work. (Doc. 51, p.3). This

physical was  required by WVHCS policy prior to an employee's return to work but

there is no explanation of its necessity at that time since defendant had already

decided that the plaintiff's employment would be terminated and had notified other

affected employees of their terminations. (Doc. 50, ¶ 115).   On May 14, 2002 upon

the successful completion of this Employee Health Department Physical, plaintiff was

cleared to return to work on May 20, 2002. (Doc. 51, p.3). On May 16, 2002, Stapert

and Paczkowski, called plaintiff to a meeting at which they informed her that her

employment with WVHCS was being terminated as part of the 2002 Reorganization

of WVHCS. (Doc. 26, ¶¶ 123-124, Doc. 50, ¶¶ 123-124).   Paczkowski told Madden

that she had been selected for termination on a cost center basis. (Doc. 26, ¶ 125,

Doc. 50, ¶ 125).   Defendant terminated Madden's employment before she returned

from her FMLA leave.  At the time of her termination, Madden was the least senior

billing clerk in cost center 29093 and the second oldest person in the entire

department. (Doc. 50, ¶ 183, Doc. 55, ¶ 183).

    In her complaint, Madden alleged, *inter alia*, that Stapert acted in

contravention of the written Policy by selecting a cost center to be affected by staff

reductions and further violated the Policy by failing to apply any of the enumerated

criteria for staff reductions, e.g. request volunteers.  Plaintiff asserts that these

departures from policy resulted in termination of her employment based on her age,

disability and FMLA leave status rather than on the permissible basis of seniority.

Defendant advances the following contentions in support of its motion for

summary judgment: (1) plaintiff cannot prevail on either her age or disability

discrimination claims since she cannot establish that the reason for termination of her

employment was for any reason other than her seniority status during the 2002

Reorganization or that the circumstances of her employment termination give rise to

an inference of discrimination; and (2) plaintiff cannot meet her burden of proof upon

her claim of discrimination and retaliation in violation of the FMLA, since FMLA

does not protect employees from employment action that would have occurred despite

the employee's lave of absence.

## III.   ADEA & PHRA CLAIMS

Madden's action must be analyzed under the McDonnell Douglas line of cases

for purposes of both her ADEA and PHRA claims.  See McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Texas Dep't of

Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981);

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407

(1993). The McDonnell-Douglas framework first requires the plaintiff to establish a

prima facie case of age discrimination.  The burden of proof then shifts to the

defendant, who must offer a legitimate, non-discriminatory reason for the termination

of the plaintiff's employment.  A legitimate, non-discriminatory reason having been

established the burden  returns to the plaintiff to establish by a preponderance of the

evidence that the proffered explanation for termination of employment is mere pretext.

Texas Dep. Of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

WVHCS has conceded, for purposes of its summary judgment motion, that

Madden has established a prima facie case of discrimination.  Therefore, there is no

reason for discussion of the first prong of the McDonnell-Douglas rubric and the court

will direct its attention only to the remaining two  requirements under McDonnell-

Douglas.

### a.  WVHCS'S Proffered Legitimate, Non-Discriminatory Reason

In 2002 WVHCS began a system wide reorganization and staff reduction.  As

previously noted, all staff reductions are regulated by the written Staff Realignment

Policy, which was in effect at the time of plaintiff's termination, that establishes a

hierarchy for dismissals with trial period employees to be discharged first, followed

by employees with poor performance records, then volunteers and finally employees

with the least senior status.  At the time of her discharge from employment, Madden,

by her own admission, was the least senior member of cost center 29093 but not by

job classification within WVHCS.  It is because of this cost center seniority status that

defendant alleges it terminated her employment.  Termination of employment based

solely on seniority is lawful and satisfies a defendant's burden of establishing a

legitimate, non-discriminatory reason for its actions. Reynolds v. Land O'Lakes, Inc.,

112 F. 3d 358, 362 (8th Cir. 1997).

Had Madden been the least senior employee within the Patient Business

Services Department or WVHCS then the case before the court would be far more

straight forward than the facts here presented.  It is important to note that plaintiff was

not in fact the least senior member of Patient Business Services but rather that status

belonged to Carla Sherlinski, who was a 37 year old trial period billing clerk assigned

to cost center 29092 within the Department. (Doc. 26, ¶ 145, Doc. 50, ¶ 145).   This

being the case, it appears that WVHCS did not in fact terminate Madden's

employment based on departmental seniority. However, WVHCS claims that,

notwithstanding the written regulations, it has followed an "unwritten policy" under

which its custom is to identify a particular cost center for staff reduction and then to

apply the Policy criteria solely within that cost center.

Madden correctly points out that WVHCS has identified no writing which

indicates the existence of this unwritten policy of cost center selection.  Defendant has

offered evidence that selection of a cost center for staff reduction is the means by

which WVHCS conducted at least one prior reduction of force in 2000.  (Doc. 26, ¶

11

38).  During the 2000 reorganization, Madden concedes that she was one of two billing clerks in 29093 notified of a future layoff based upon seniority.  (Doc. 26, ¶ 54, Doc. 50, ¶ 54).  Carla Sherlinski was also notified of a future layoff date based on cost center seniority in 2000.  At that time Sherlinski was assigned to cost center 29092 and she subsequently left the defendant's employ.[3]

WVHCS further maintains that the cost center policy is the only way to ensure that departments retain the essential number of employees to effectuate their purpose within WVHCS.  For example, the least senior member in an entire department may be a person who holds a vital position which must remain staffed in order to guarantee that the department operates as it is supposed to operate.  Reduction by department would result in that employee's termination instead of the termination of a more senior employee who holds a less vital position.  Acknowledging this reasoning, it still must be noted that there is no indication or argument that Sherlinski, the least senior member of the department, held such a vital position.

There is extensive testimony by Stapert regarding his selection of Cost Center

---

[3]Sherlinski was originally hired by WVHCS in June 1995 and was assigned to the Admissions Department.  In 1996 she applied for and received a billing clerk position in Cost Center 29092.  In June 1999, Sherlinski was transferred to Cost Center 29091 along with her primary payor.  In July 2000, Sherlinski returned to 29092 with the reassignment of her primary payor.  In May 2000, Sherlinski was notified of a future layoff date of March 2001 and she remained in cost center 29092 until that time.  Sherlinski resigned her employment effective March 31, 2001.  In late 2001 Sherlinski applied for and received a billing clerk position in cost center 29092 commencing February 11, 2002.  (Doc. 26, ¶¶ 132-146, Doc. 50, ¶¶ 132-146).

29093 for reduction.  In March 2002, WVHCS's CFO, Mike Scherneck, told Stapert

that Stapert must eliminate one management full-time equivalent ("FTE") and two

non-management FTE positions in the Patient Business Services Department.  (Doc.

26, ¶¶ 71-72, Doc. 50, ¶¶ 71-72).  Stapert initially eliminated the two part time billing

clerks with the least seniority from Cost Center 29090.  (Doc. 26, ¶¶ 80, 110, Doc. 50,

¶¶ 80, 110).  Stapert testified that he selected cost center 29090 for a reduction in staff

since that cost center was primarily dedicated to serving an entity which had been

closed since June 30, 2001.  (Doc. 26, ¶ 79, Doc. 50, ¶ 79).  He explained that Cost

Center 29090 could not withstand any further reductions after the initial two since it

retained only one full time billing clerk on staff.  (Doc. 26, ¶79, Doc. 50, ¶79).

Stapert further testified that he analyzed several objective criteria to determine which

cost center should be affected by the next non-management FTE termination.  He first

examined the billing clerks lost by each cost center during the 2000 staff reduction to

conclude that cost center 29093 had lost the fewest, i.e., two billing clerks.  (Doc. 26,

¶ 83, Doc. 50, ¶ 83).  He then determined that the annual bills processed by each cost

center, based on the prior year's numbers divided by the number of billing clerks per

center, indicated that 29093 had the lightest workload with 11, 361 bills per billing

clerk.  (Doc. 26, ¶¶ 87-88, Doc. 50, ¶¶ 87-88).  Finally, Stapert reviewed the particular

payors assigned to each cost center to determine which cost center could best handle a

reduction with the least amount of disruption.  (Doc. 26, ¶ 89, Doc. 50, ¶ 89).  He

stated his conclusion that cost center 29093 was the most well suited cost center for a staff reduction.

During mid to late March 2002, when Stapert stated that he was analyzing the above factors, he had already decided to terminate the employment of, Barbara Ondek, the director of cost center 29091. (Doc. 26, ¶ 108, Doc. 50, ¶ 108).   As a result of Ondek's termination, a majority, if not all, of the billing clerks in 29091 where transferred to either cost center 29092 or 29093. (Doc. 49, Ex. D).   Additionally, Stapert knew that he had the ultimate authority to transfer billing clerks to different cost centers and could have rearranged the staff of each cost center to suit his purposes. (Doc. 51, p.10).   Finally, Stapert was aware that the results of the 2000 reorganization on each cost center were not permanent in nature since clerks and payors had been transferred in the time period between the 2000 and 2002 reorganizations. (Doc. 51, p. 9).

Having identified the cost center, Stapert did not follow the numerated policy provisions in deciding which employees to terminate. (Doc. 50, ¶ 184-185). Specifically he did not review performance records nor did he request volunteers. (Doc. 50, ¶ 184, Doc. 55, ¶ 184).   Stapert has testified that he had no need to review performance records as he was familiar with the staff and aware that there were no performance issues with the billing clerks in 29093. (Doc. 55, ¶ 184).   In fact, Madden does not provide any evidence that a person with an unsatisfactory

14

performance was retained.  Likewise, Stapert contended that he did not request volunteers because he had to make his decision regarding staff reduction prior to the reduction being announced.  Specifically he had to inform his CFO of his decisions by the first week of April 2002.  (Doc. 26, ¶ 75, Doc. 50, ¶75).  The terminations were not announced to the supervisors of non-management employees until the first week of May 2002.  (Doc. 26, ¶ 111, Doc. 50, ¶ 111).  He asserted that this time line prohibited him from considering volunteers.  (Doc. 50, ¶ 186, Doc. 55, ¶ 186).

Regardless of the notable absence of the cost center designation from the Policy and Stapert's failure to strictly adhere to the Policy, WVCHS has nonetheless provided evidence of a legitimate, non-discriminatory reason for its action. Specifically, Stapert contends that he followed an unwritten policy of resorting to cost center seniority for reduction of force.  He further claimed that cost center 29093 was designated since it had the lightest workload and was the least affected by the previous 2000 staff reduction.  Having chosen 29093, WVHCS terminated the least senior billing clerk. Therefore, our analysis must next turn to plaintiff's claim of pretext.

### b.  Pretext

"To discredit the employer's articulated reason, the plaintiff need not produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reason, nor produce additional evidence beyond her prima facie case."

15

Simpson v. Kay Jewelers, 142 F.3d 639, 644 (3d Cir. 1998) (citations omitted)

quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff must,

however, point to weaknesses and inconsistencies in the defendants proffered reason

which could cause a reasonable fact finder to conclude that the non-discriminatory

answer is "unworthy of credence."  Simpson at 644 citing Fuentes at 764-65.

Madden does not dispute that she was the least senior member in her cost center

but rather contends that defendant improperly limited its staff reduction policy to her

cost center instead of following its own Staff Reduction Policy and applying it

department wide which would have resulted in the termination of a less senior and

non-age protected employee, Carla Sherlinski.  Madden argues that Sherlinski and she

were similarly situated as billing clerks within the Patient Business Services

Department and that WVHCS's decision to terminate Madden and retain the less

senior 37 year old Sherlinski discredits WVHCS's proffered legitimate, non-

discriminatory reason.  Madden correctly notes that the Policy sets forth criteria to be

applied once a job classification for reduction was determined.  Further, it is

undisputed that Stapert did not follow the Policy although the Policy is circulated

among employees as the guide star for staff reductions.  Defendant has specifically

identified only one other occasion in which the cost center policy was applied, i.e., the

2000 reorganization.

Madden has offered evidence which, if believed, would undercut the

defendant's legitimate, non-discriminatory reason for its action.  For example, Jerry

Clifford, the Administrative Director of Clinical Services, has testified that at the time

of the 2002 Reorganization he oversaw eight (8) departments, including Physical

Medicine.  (Doc. 51, p.11).  As part of the 2002 reorganization, Clifford testified that

he was provided with a list of names and positions to be eliminated from his

departments.  (Doc. 51, p. 11).  This testimony is in conflict with the defendant's

proposition that department directors started from scratch on a cost center basis in

determining which employees to terminate.  Further, Clifford's testimony at least

implies that Physical Medicine Department Director, Brenda Fernando, who was

under Clifford's direct supervision, was also provided with a predetermined list of

names for termination.  While the most senior director may have indeed identified a

cost center and then applied the written Policy in compiling this list, there is no such

testimony of record.

     Moreover, plaintiff's argument that Stapert failed to follow the Policy steps

once a cost center was picked appears to discredit the defendant's proffered legitimate,

non-discriminatory reason for its action.  The Policy requires that trial period

employees, employees with performance issues and volunteers all be considered

before employees are eliminated on the basis of seniority.  Stapert testified that he

followed these steps to the extent possible.  He stated that he could not elicit

volunteers since the termination decision had to be rendered before the reduction in

force was announced.  However, he did not explain why he could not ask for

volunteers at the time of the announcement which would allow a volunteer to replace

an employee already designated for termination.  While Stapert admits that he did not

review the performance records of the cost center employees he also states that he was

acquainted with the workers in 29093 and knew of no performance problems.  This

may in fact be the case but Stapert's failure to review performance records appears to

dilute WVHCS's proffered reason for terminating Madden and may indicate instead

that there was no need for performance review since the employees to be terminated

were predetermined.  The credibility of this testimony presents an issue for a jury.

Nonetheless, there is no evidence that indicates a performance  review would have led

to Madden's retention.

Madden also presents an argument that Stapert transferred her to 29093 from

29091 in a deliberate attempt to position her, an age protected employee, as the least

senior member in 29093 at the time of staff reduction and thereby ensure that he was

able to eliminate a member of a protected class for seemingly legitimate reasons.

Madden does admit that she was transferred in conjunction with the transfer of

QualMed/PHS, which was her primary payor (Doc. 50, ¶¶ 34-36) and that

QualMed/PHS was transferred to 29093 because of problems that payor had with the

director of cost center 29091.  Regardless, Madden's claim tends to poke holes in the

defendant's legitimate non-discriminatory reason since Stapert did have the authority

18

to transfer billing clerks freely.  This being the case, Stapert could have transferred Madden to a particular cost center if he was either desirous of terminating her employment or retaining her.   Plaintiff maintains that Stapert could have "bumped" Madden from 29093 and Sherlinski into 29093 to result in the termination of the least senior department member. While defendant explains this away by arguing that the Policy does not provide for such bumping, its stance is challengeable by its own argument that the written Policy is merely a "guideline" and that, in fact, its customary practices do not involve the procedures delineated in the Policy.

Had Stapert swapped Madden and Sherlinski, WVHCS would have inevitably been left with the task of training either Sherlinski or another billing clerk to handle Madden's primary payor, QualMed/ PHS.  However, WVHCS may not be able to justify its decision not to bump on an attempt to avoid the time and burden of providing training since, even without bumping, training of other employees was necessary.  Upon her termination, Madden's workload was divided among two (2) to four (4) employees within cost center 29093. (Doc. 26, ¶ 131, Doc. 50, ¶ 131).  All of these employees were younger than Madden and each of them had to be trained to take over Madden's duties.  (Doc. 26, ¶ 131, Doc. 50, ¶ 131).  These individuals had to be trained for several weeks to take over Madden's duties.  (Doc. 50, ¶ 131).

A question of inconsistency also arises concerning defendant's failure to explain why it required Madden to submit to a return to work physical when her

termination from employment had already been decided.  WVHCS requested the

physical on May 13, 2002 and Madden successfully passed the physical on May 14,

2002.  Non-management employees were notified of terminations during the first

week of May 2002 but Madden was not so advised until May 16, 2002 after the

completion of her physical.  It is arguable that if defendant had a legitimate, non-

discriminatory reason for terminating plaintiff's employment it would seem

appropriate to notify Madden on May 13, 2002 when she informed defendant of her

readiness to return to work, inasmuch as similarly situated non-management

employees had previously been notified.

Finally, Madden argues that Stapert's reasons for choosing cost center 29093

were short sighted and inaccurate.  Specifically, Madden alleges that all the cost

centers had changed significantly since the 2000 Reorganization and so consideration

of the effect of the 2000 reduction on each cost center was irrelevant.  (Doc. 51, p.19).

Additionally, Madden points out that Stapert's projections of how many bills per FTE

would be handled in each cost center were inaccurate since cost center 29091 was

ultimately going to be eliminated and its billing clerks reassigned among the other

cost centers.  Further it is contended that these projections ignored the fact that Stapert

could freely transfer billing clerks to cost centers that were understaffed.  While

"pretext is not demonstrated by showing simply that the employer was mistaken in its

business judgment," <u>Martin v. Allegheny Airlines</u>, 126 F. Supp. 2d 809, 819, (M.D.

Pa. 2000) *quoting* <u>Grove v. H.E.F., Inc.</u>, 1998 WL 107179, *3 (E.D. Pa. 1998),

Plaintiff has again advanced facts which may discredit WVHCS's proffered reason for

termination.

The cumulative evidence to which Madden points may be viewed as

establishing inconsistencies in the defendant's proffered reason for its actions which

could cause a reasonable fact finder to reject it as unworthy of belief.  More

importantly, much of the evidence is undocumented and its acceptance is dependent

upon the credibility of the witnesses.  Therefore, summary judgment cannot properly

be entered on the plaintiff's ADEA and related PHRA claims.  Accordingly, the

defendant's motion for summary judgment on the plaintiff's ADEA and PHRA claims

will be denied.

### IV.    ADA and PHRA Claims

Madden's ADA claims must also be examined under the shifting burden

analysis set forth in <u>McDonnell Douglas</u>.  <u>McDonnell Douglas Corp. v. Green</u>, 411

U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  PHRA claims are also interpreted in

accordance with the ADA and so require an identical analysis.   <u>Kelly v. Drexel

University</u>, 94 F.3d 102, 105 (3d Cir. 1996).  Accordingly, Madden must first set forth

a prima facie case of discrimination based on disability.  WVHCS must then offer a

legitimate, non-discriminatory reason for the decision which adversely affected the

plaintiff's employment.  Finally, the plaintiff bears the burden of showing by a preponderance of the evidence that the defendant's stated non-discriminatory reason for its action is merely pretext.

To establish a *prima facie* case of discrimination under the ADA, Madden must show that (1)she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination.  <u>Williams v. Philadelphia Housing Authority Police Dept.</u>, 380 F.3d 751, 761 (3d Cir. 2004).  The ADA defines disability as:

(1) a physical or mental impairment that substantially limits one or more of the major life  activities of such individual; or

(2) a record of such an impairment; or

(3) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

"A record of such impairment" has been interpreted to mean having a history of, or being misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.  29 C.F.R. § 1630.2(k). The regulations further define "regarded as having such an impairment" as (1) having a physical or mental

impairment that does not substantially limit major life activities but is treated by a

covered entity as constituting such limitation; (2) having a physical or mental

impairment that substantially limits major life activities only as a result of the attitudes

of others toward such impairment; or (3) having no impairment at all, but treated by

defendant as having a substantial limiting impairment.  29 C.F.R. § 1630.2(1).

For purposes of its summary judgment motion the defendant assumes that

Madden's maladies, nephrectomy and gallbladder surgery, and/or her lung condition,

constitute physical impairments under the ADA.  (Doc. 25, p. 25).   It does not,

however, concede that said impairments limited a major life activity.  In fact, by her

own admission, Madden's impairments did not limit her in a major life activity.  (Doc.

26, ¶¶160-163, Doc. 50, ¶¶160-163).  Specifically, Madden admits that her conditions

did not limit her ability to work, her ability to breathe, her ability to stand or her

ability to walk.  (Doc. 26, ¶¶160-163, Doc. 50, ¶¶160-163).   Therefore, she has failed

to establish that she actually suffered from a disability under the ADA.  Likewise she

can not succeed on a claim asserting a record of such impairment since there has been

no showing that such a record exists.   Further, she has not pointed to any evidence

which illustrates that WVHCS "misclassified" her as having such an impairment.

Prior to her termination the only record of any medical issue was plaintiff's six (6)

week leave of absence for a nephrectomy after which she returned to work without

any accommodation.  (Doc. 26, ¶¶ 153-154, Doc. 50, ¶¶ 153-154).  Madden has failed

to point the court to any evidence which even suggests that her medical record either actually or mistakenly reflected that she had a disability under the ADA.

Similarly, plaintiff cannot succeed on a claim that she was regarded as having a disability.  While WVHCS did have knowledge of Madden's medical history, "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that the perception caused the adverse employment action."   Grabosky v. Tammac Corp., 127 F. Supp. 2d 610, 618 (M.D. Pa. 2000).  Madden does not identify any evidence that WVHCS regarded her as disabled other than its knowledge of her prior illness and its decision to terminate her employment.  Consequently, defendant's motion for summary judgment will be granted and these claims will be dismissed.

### V. FMLA Claims

The FMLA requires that an employee, upon returning from leave, be reinstated to her former position, or an equivalent position.  29 U.S.C. § 2614(a)(1).  Regardless, this reinstatement right does not entitle an employee to be restored to a position to which the employee would not have been entitled had the employee not taken the leave.  29 U.S.C. § 2614(a)(3)(b).  Much of the evidence previously reviewed in the ADEA and PHRA claims is applicable here but some of it must necessarily be revisited in addressing the FMLA claim.

Stapert has testified that he was notified of the 2002 reorganization and ensuing layoffs sometime in mid-late March 2002.  (Doc. 26, ¶ 71).  He had to inform his CFO by the first week of April 2002 of his decision regarding which cost centers and employees would be affected.  (Doc. 26, ¶ 75, Doc. 50, ¶75).  Stapert admitted that he advised non-management employees of their terminations during the first week of May 2002.  (Doc. 50, ¶ 74(a)).

Madden requested and was granted FMLA leave by Stapert on April 18, 2002. (Doc. 51, p. 25).  While the record is clear that Stapert knew at that time that Madden would be terminated, there is no explanation why he did not notify plaintiff of her termination upon her request for FMLA leave.  This may be a factor in evaluating the credibility of  the defendant's stated reasons for deciding to terminate Madden's employment.  See <u>Moorer v. Baptist Memorial Health Care System</u>, 398 F.3d 469,488 (6th Cir. 2005); <u>Arban v. West Publishing Corp.</u>, 345 F.3d 390,401 (6th Cir. 20032). Likewise, there is no explanation of Stapert's failure to notify Madden during the first week of May when he notified other non-management employees of their terminations.  (Doc. 26, ¶ 76).  Similarly, the reason for requiring Madden to undergo a return to work physical when WVHCS had already decided to terminate her employment remains unanswered.  Finally, WVHCS does not explain why Madden was not notified of her termination when she spoke to her supervisor on May 13, 2002. (Doc. 26, ¶ 117, Doc. 50, ¶ 117).

Defendant rests on its argument that Madden was going to be terminated regardless of her FMLA leave based upon her seniority within cost center 29093.  As discussed above, it is unclear whether the real reason for terminating Madden's employment was based on her cost center seniority.  Madden has sufficiently countered defendant's legitimate, non-discriminatory reason for termination and the facts of record do not foreclose a finding that Madden's termination was related to her FMLA leave.  The time line of events in notifying Madden of her termination is also puzzling.   Again, if WVHCS was going to terminate Madden regardless of her FMLA leave status then it would have been logical to notify her of this decision at the earliest possible date.

For these reasons, defendant's motion for summary judgment on the FMLA claim will be denied.


Date: April 26, 2005                    s/ William J. Nealon
                                        United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARIE MADDEN,                          :
       Plaintiff                      :
                                      :
   v.                               :          Civil Action No. 3:04-344
                                      :
WYOMING VALLEY HEALTH        :          (JUDGE NEALON)
CARE SYSTEM, INC.,                :
       Defendant                      :

## ORDER

**AND NOW**, this 26th day of April, 2005, in accordance with the

accompanying Memorandum of this date,  **IT IS HEREBY ORDERED THAT:**

Defendant's Motion for Summary Judgment is GRANTED in part and DENIED

in part:

(1) the Motion is DENIED as it pertains to Plaintiff's ADEA and related

PHRA claims;

(2) the Motion is GRANTED as it pertains to Plaintiff's ADA and related

PHRA claims, accordingly these claims are dismissed; and

(3) the Motion is DENIED as it pertains to Plaintiff's FMLA claims.


                                        s/ William J. Nealon
                                  United States District Judge